FILED

2020 May-13  AM 08:28
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## JASPER DIVISION

TERRY MARTIN,                           )
     Plaintiff,                        )
                        )
v.                                      )            6:19-cv-01534-LSC
                        )
SHERIFF OF WALKER                       )
COUNTY, *et al.*,                       )
     Defendants.                       )

### MEMORANDUM OF OPINION

Before the Court are Defendant Walker County's ("Walker County") Motion to Dismiss (doc. 3), and Defendants Sheriff James E. Underwood ("Underwood"), Richard Calloway ("Calloway"), Phillip Robinson ("Robinson"), and Laura Tirey's ("Tirey") (collectively the "law enforcement defendants") Motion to Dismiss (doc. 5). Plaintiff Terry Martin ("Martin") brought this suit under 42 U.S.C. § 1983 for compensatory and punitive damages for injuries he suffered while he was a pretrial detainee at the Walker County Jail (the "Jail"), where he alleges he was assaulted by two other inmates. He alleges a failure to protect claim against all law enforcement defendants, a failure to supervise/train claim against Underwood, and a failure to fund claim against Walker County. Martin also alleges state law claims for negligence and wantonness against all defendants.

He sues all law enforcement defendants in both their official and individual capacities.

For the reasons stated below, Walker County's motion is due to be denied. Further, the law enforcement defendants' motion is due to be granted in part and denied in part.

## I.     BACKGROUND[1]

### A. Jail Conditions and Policies

This action concerns the conditions of confinement at the Jail and, more specifically, the W-Dorm within the Jail.  According to Martin, officials at the Jail did not ask new inmates about their mental health or whether they had conflicts with persons already in the jail, and mentally ill persons are not segregated from those in good mental health.  Inmates allegedly are not segregated based on their proclivity for violence, and pretrial detainees are not segregated from convicted prisoners.  The Jail is said to have no policy, procedure, custom, or practice for documenting or reporting incidents of inmate on inmate assaults, and inmates are rarely if ever disciplined.

---

[1]     In evaluating a motion to dismiss, this Court "accept[s] the allegations in the complaint as true and construe[s] the facts in the light most favorable to the plaintiff."  *Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1275 (11th Cir. 2012).  Therefore, the following facts are taken from Martin's complaint, and the Court makes no ruling on their veracity.

Within the Jail, W-Dorm houses inmates classified as "general population or being capable of functioning in larger groups and not considered a security risk." (Doc. 1-1 ¶ 16.)  W-Dorm is a two-story cellblock: the first floor contains a common area or "day room," and the second floor contains cells to house inmates.  Martin's complaint alleges that W-Dorm inmates can roam freely, even when they are confined to their cells because the locks do not work.  Further, because the Jail is in such a "dilapidated" state, W-Dorm inmates are known to break off loose pieces of concrete and to fashion weapons out of metal strips from loose window and door casings.  W-Dorm inmates are supervised remotely by a guard in a central pod-control unit who is otherwise unable to see or hear the inmates.  This guard watches a monitor of a video stream from a single surveillance camera located in the day room.  The guard is to "alert the senior officer on duty of anything out of the ordinary." (*Id.* ¶ 21.)  W-Dorm inmates are also supervised by a guard who makes hourly rounds.

Underwood had policies (or a lack thereof) at the Jail which Martin asserts resulted in deliberate indifference to inmates' constitutional rights.  Specifically, Martin contends that Underwood had a policy of failing to train jailers on how to document, investigate, and respond to incidents of inmate on inmate violence; a policy of failing to train jailers to monitor and supervise inmates to protect against

incidents of inmate on inmate violence; a policy of failing to staff the Jail with enough personnel to protect inmates from violent assaults; and a policy of failing to adequately train the Jail staff, all of which allowed Martin's injuries to occur.

Martin alleges that prior to his injuries, Underwood and Walker County knew that the Jail was unsafe due to overcrowding, understaffing, and its dilapidated condition. Underwood is said to have reported to Walker County that the Jail needed over $2 million in upgrades and improvements to protect the safety of inmates, including repairs to defective and inoperative surveillance cameras and the installation of 33 additional cameras to supervise areas of the Jail that are known blind spots. Further, Martin alleges that the Jail was short at least 12 full time employees, leaving only a "skeletal crew" to supervise over 240 inmates at any given time. According to Martin, when fights among inmates arose, staff were either unable or too afraid to respond. Notwithstanding this prior knowledge, Walker County failed to fund repairs, improvements, or upgrades to the Jail. Further, Walker County failed to fund adequate staff for each shift to supervise inmates and respond to fights.

### B. Martin's Injuries

On or about December 22, 2017, Martin was arrested and remanded to the custody of the Jail, where he was assigned to W-Dorm. Also assigned to W-Dorm were inmates Justin Kyle Murray ("Murray") and Kiley Rashan Casey ("Casey").

During their time in W-Dorm, Murray and Casey "started a gang where they would use threats of violence and physical attacks to create an environment of fear and intimidation to extort commissary items from other inmates." (*Id.* ¶ 25.) The complaint alleges that other W-Dorm inmates reported to "jail staff" that Murray and Casey had committed "multiple" assaults on inmates. (*Id.* ¶ 26.) Despite the reports, Martin contends Murray and Casey were not disciplined or assigned to segregation, and they were allowed to remain in W-Dorm "without restriction." (*Id.* ¶ 27.) Further, during his first thirty days in W-Dorm, Martin claims he saw Murray and Casey instigate "six or seven other fights" with inmates. (*Id.* ¶ 30.)

The complaint alleges that on or about January 21, 2018, Murray and Casey assaulted Martin outside of his cell after he refused their demand for an e-cigarette and pack of coffee (the "first assault"). They allegedly beat Martin "repeatedly about the head and face." (*Id.* ¶ 29.) Martin was unable to protect himself and had to rely on another inmate to intervene and stop the assault. He claims that no guards came to help stop the assault.

According to the complaint, Calloway saw Martin later that same day with bruising around his eyes and asked him what happened. Martin was too afraid "of reprisal" to report the assault and thus told Calloway that he was "exercising with the young-uns." (*Id.* ¶ 31.) According to Martin, Calloway was dismissive of

Martin's explanation, said "yeah-right," and told Martin to "watch that exercising with them young-uns." (*Id.* ¶ 32.) Calloway did not investigate the incident or take any further action. Three days later, Robinson saw Martin with two black eyes and asked him what happened. Again, Martin was too afraid to report the assault and thus told Robinson that he had been "exercising with them young-uns." (*Id.* ¶ 34.) According to Martin, Robinson was dismissive of Martin's explanation and said "yeah-right." (*Id.* ¶ 35.) Robinson did not investigate the incident or take any further action.

Martin alleges that four days after the first assault, Murray and Casey assaulted him again, this time in front of the surveillance camera in the day room (the "second assault"). He claims Murray and Casey beat him in the head and put him in a choke hold until he passed out and fell to the floor. While he was unconscious, Murray and Casey kicked him and repeatedly slammed his face and head against the concrete floor. Martin contends that no guards came to intervene or stop the attack. Murray and Casey then dragged Martin upstairs to his cell and left him there. Martin alleges he was discovered unconscious, bruised, and bloody in his cell several hours later by the Jail staff who were feeding lunch. He spent thirteen days in the ICU and underwent multiple surgeries to repair the damage from the assault. He is now blind in his right eye and has other significant injuries to his face.

The complaint alleges that at the time of the second assault, the law enforcement defendants were on duty at W-Dorm. Calloway was the senior officer on duty and was responsible for overseeing the operation of the Jail. Robinson was assigned to pod control and was responsible for supervising the inmates by observing the monitor from the surveillance camera in the day room. Robinson did not intervene, alert the senior officer on duty, or otherwise take any action to stop the second assault. Further, Tirey was responsible for making hourly rounds, but she failed to do so.

## II.    STANDARD OF REVIEW

In general, a pleading must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, to withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), "a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1347–48 (11th Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Stated another way, the factual allegations in the complaint must be sufficient to "raise a right to relief above the speculative level." *Edwards v. Prime,*

*Inc.*, 602 F.3d 1276, 1301 (11th Cir. 2010) (quoting *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309 (11th Cir. 2008) (per curiam)).  A complaint that "succeeds in identifying facts that are suggestive enough to render [the necessary elements of a claim] plausible" will survive a motion to dismiss. *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1296 (11th Cir. 2007) (quoting *Twombly*, 550 U.S. at 556) (internal quotation marks omitted).

In evaluating the sufficiency of a complaint, this Court first "identif[ies] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.  This Court then "assume[s] the[] veracity" of the complaint's "well-pleaded factual allegations" and "determine[s] whether they plausibly give rise to an entitlement to relief." *Id.*  Review of the complaint is "a context-specific task that requires [this Court] to draw on its judicial experience and common sense." *Id.* If the pleading "contain[s] enough information regarding the material elements of a cause of action to support recovery under some 'viable legal theory,'" it satisfies the notice pleading standard. *Am. Fed'n of Labor & Cong. of Indus. Orgs. v. City of Miami*, 637 F.3d 1178, 1186 (11th Cir. 2011) (quoting *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 683–84 (11th Cir. 2001)). Ultimately, the Court must be able to draw a reasonable inference from the facts that the other party is liable.  *Reese v. Ellis, Painter, Ratterree & Adams, LLP*, 678 F.3d

1211, 1215 (11th Cir. 2012). The Court must construe pleadings broadly and resolve inferences in the nonmoving party's favor. *Levine v. World Fin. Network Nat'l Bank*, 437 F.3d 1118, 1120 (11th Cir. 2006).

## III.    DISCUSSION

Walker County seeks to dismiss the § 1983 failure to fund claim, arguing that Martin failed to allege a sufficient causal link between the failure to fund and his injuries.[2] Calloway, Robinson, and Tirey seek to dismiss the § 1983 failure to protect claims, arguing that they are entitled to qualified immunity. Similarly, Underwood argues that he is entitled to qualified immunity from the § 1983 failure to protect and failure to supervise claims. The law enforcement defendants also seek dismissal of the state law claims, arguing that they are entitled to sovereign immunity under Alabama law. This Court will address each argument in turn.

### A. Walker County

An action may be brought under § 1983 for the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C § 1983. To make out a claim against a county under § 1983, a plaintiff must allege that "the constitutional violation occurred as a result of a county policy[,] . . . the [county's]

---

[2]    Martin also brought a state law claim for negligence and/or wantonness against Walker County. (*See* Doc. 1-1 at 32–33.) Walker County did not move to dismiss this claim.

action was taken with the requisite degree of culpability, and . . . a direct causal link [exists] between the [county's] action and the deprivation of federal rights." *Cagle v. Sutherland*, 334 F.3d 980, 986 (11th Cir. 2003) (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404 (1997)).  Culpability can be established by showing deliberate indifference, which requires "(1) subjective knowledge of a risk of serious harm; (2) [and] disregard of that risk; (3) by conduct that is more than mere negligence." *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999).

In Alabama, counties are responsible for appropriating the funds necessary to cover jail costs.  Ala. Code §§ 11-14-19, 11-14-20; *Turquitt v. Jefferson Cty.*, 137 F.3d 1285, 1290 (11th Cir. 1998) (en banc).  By contrast, the "daily management" of the jail is the sheriff's responsibility.  *Turquitt*, 137 F.3d at 1291.  Therefore, Walker County can incur liability under § 1983 for not appropriating the funds that the sheriff needs for maintenance of the jail.  *See id.* at 1290.

Martin alleges that Walker County had a policy of inadequately funding the Jail—specifically, that Walker County failed to provide funding for upgrades to the Jail's surveillance equipment and for adequate staffing.  He alleges that the Jail was short at least 12 full time employees, leaving only a "skeletal crew" to supervise over 240 inmates at any given time.  As a result, when fights among inmates arose, staff were either unable or too afraid to respond.   Martin alleges that no guards tried to

intervene or stop either assault against him.  He also claims that Walker County knew that staffing at the Jail was grossly inadequate prior to the assaults.  He claims that Walker County made the decision not to properly fund the Jail with knowledge of the risks to the inmates' safety, and that this policy caused Martin's injuries.

Walker County argues that Martin failed to allege a sufficient causal link between the failure to fund and his injuries.  Martin alleges that no guards tried to intervene or stop either assault, and that Walker County's failure to fund left the Jail with inadequate staff and surveillance cameras for supervising inmates and responding to fights.  He claims that this policy of inadequate funding caused his injuries.  Therefore, Martin has alleged a sufficient causal link between Walker County's failure to fund and his injuries.

Martin has pled sufficient facts to make out a claim for deliberate indifference against Walker County under § 1983.  Therefore, Walker County's motion to dismiss is due to be denied as to this claim.

### B.  Law Enforcement Defendants

#### 1.  § 1983

To establish a claim under § 1983 against an individual, a plaintiff must show that a person acting under color of state law deprived him of a federal right.  *Myers v. Bowman*, 713 F.3d 1319, 1329 (11th Cir. 2013).  While prison officials have a

constitutional duty to protect inmates, "[a] prison custodian is not the guarantor of a prisoner's safety." *See Popham v. City of Talladega*, 908 F.2d 1561, 1564 (11th Cir. 1990). To survive a motion to dismiss on a Fourteenth Amendment[3] failure to protect claim, a plaintiff must plausibly allege "(1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) a causal connection between the defendants' conduct and the [constitutional] violation." *Brooks v. Warden*, 800 F.3d 1295, 1301 (11th Cir. 2015). A prison official acted with deliberate indifference if he knowingly disregarded an excessive or substantial risk to inmate health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). This knowledge requirement is satisfied only if the prison official was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and he drew that inference. *See id.* Whether the prison official "had the requisite awareness of the risk 'is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was

---

[3]     At the time of his alleged injuries, Martin was a pretrial detainee. Therefore, his claims are due to be analyzed under the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment, which applies to convicted prisoners. *See Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996). "However, the applicable standard is the same, so decisional law involving prison inmates applies equally to cases involving arrestees or pretrial detainees." *Id.*; *see also Valderrama v. Rousseau*, 780 F.3d 1108, 1121 n.16 (11th Cir. 2015).

obvious.'" *Goodman v. Kimbrough*, 718 F.3d 1325, 1332 (11th Cir. 2013) (quoting *Farmer*, 511 U.S. at 842).

However, even if a plaintiff succeeds in showing a constitutional violation, government officials sued in their individual capacities are entitled to raise the defense of qualified immunity. *See Simmons v. Bradshaw*, 879 F.3d 1157, 1162 (11th Cir. 2018). Officials are shielded by qualified immunity as long as "their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity allows government officials to carry out the discretionary duties of their position "without the fear of personal liability or harassing litigation, protecting from suit 'all but the plainly incompetent or one who is knowingly violating federal law.'" *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (citations omitted) (quoting *Willingham v. Loughnan*, 261 F.3d 1178, 1187 (11th Cir. 2001)).

The Eleventh Circuit engages in a two-part analysis to determine whether a government official is entitled to the defense of qualified immunity. "First, the official must prove that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority. Second, if the official meets that burden, the plaintiff must prove that the official's conduct violated clearly

established law." *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998) (citations omitted). It is undisputed that the law enforcement defendants were acting within the scope of their discretionary authority when the incidents in question occurred.[4] Therefore, the Court will consider whether the defendants' conduct violated the law.

### a. Tirey

Martin alleges that Tirey's failure to protect him from the assaults violated his constitutional rights. He argues that Tirey was deliberately indifferent to the substantial risk of serious harm posed by Murray and Casey and the general unsafe conditions at the Jail. Even construing the complaint's factual allegations and all reasonable inferences in his favor, Martin's failure to protect claim fails because he has not plausibly alleged that Tirey had the requisite knowledge of the risk of harm.[5] Martin's allegation that, prior to the first assault, other W-Dorm inmates had reported multiple assaults committed by Murray and Casey to "jail staff" is insufficient to show that *Tirey* had subjective knowledge of those assaults. Further,

---

[4] In his complaint, Martin alleged that Robinson, Tirey, and Calloway were jailers, and that Underwood was acting under color of law and pursuant to the customs, policies, and practices of the Jail. Further, Martin did not respond to the argument in defendants' motion to dismiss that they were acting within scope of their discretionary authority.

[5] This Court will assume without deciding that Martin sufficiently alleged a substantial risk of serious harm.

although Martin allegedly saw Murray and Casey instigate six or seven other fights with inmates prior to the first assault, Martin does not allege that Tirey (or any Jail staff for that matter) saw any of the fights or that he told anyone about them. No other allegations suggest that there was a pre-existing problem involving him, Murray, and Casey that would have put Tirey on notice of a risk of harm; indeed, Martin claims that the first assault arose from a dispute over e-cigarettes and coffee. Even assuming that Tirey was generally aware that Murray and Casey ran a gang for the purpose of extorting commissary items from other inmates, this awareness is not enough to show that Tirey had subjective knowledge of a substantial risk of serious harm to *Martin*. *See Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099–1100 (11th Cir. 2014).

Nor was Tirey deliberately indifferent by failing to protect Martin from the second assault. Martin has not alleged that Tirey was ever subjectively aware of the first assault: he does not allege that anyone told Tirey about the first assault, nor that he and Tirey had a conversation about his injuries from the first assault. Further, although Martin alleges that Tirey was on duty during the second assault, he has not alleged facts indicating that she was actually, subjectively aware of the second assault when it was ongoing. Therefore, her alleged failure to intervene or stop the second assault was not deliberately indifferent because she did not even know it was

happening.  The most that could be said is that during the morning of the second assault, Tirey failed to do her hourly rounds as required, which meant that Martin's injuries were not discovered for several hours.[6]  This failure may constitute negligence, which falls short of the culpability required to show deliberate indifference.  *See Farmer*, 511 U.S. at 835 (explaining that deliberate indifference requires "a state of mind more blameworthy than negligence").  In sum, Martin has failed to plausibly allege that Tirey was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that she drew that inference.  *See id.* at 837.[7]

---

[6]      In one of his response briefs, Martin argues, in one sentence, that the law enforcement defendants' failure to find him sooner on the morning of the second assault violated his constitutional right to receive timely medical care.  The defendants did not respond to this argument in their reply.  While pleadings are "to be liberally construed so as to do substantial justice, . . . a defendant is entitled to know the extent of the claim being made against him, as well as its nature."  *United States v. Classified Parking Sys.*, 213 F.3d 631, 633 (5th Cir. 1954).  This Court cannot fairly construe Martin's complaint, in its current form, as alleging a claim of inadequate medical care.  Martin alleges that after the Jail staff discovered him in his cell, Martin was taken to the hospital and underwent multiple surgeries.  There is no allegation in the complaint that, for example, Martin's injuries were exacerbated by Jail staff's alleged delay in discovering them.

[7]      Martin complains about other dangerous conditions at the Jail, including the Jail's failure to segregate convicted prisoners from pretrial detainees or mentally ill persons from those in good mental health, and inmates making homemade weapons out of pieces of concrete and metal strips.  Even accepting these allegations as true, they are not relevant to Martin's claims.  Martin alleges he was attacked by other pretrial detainees, not convicted prisoners; he does not allege that they were mentally ill; and they allegedly assaulted him with their hands and feet, not homemade weapons.

Because Martin does not demonstrate that Tirey was subjectively aware of a substantial risk of serious harm to him, he cannot maintain his failure to protect claim against her, and it is due to be dismissed.[8]

### b. Calloway

Martin alleges that Calloway's failure to protect him from the assaults violated Martin's constitutional rights. He claims that Calloway had subjective knowledge of a substantial risk of serious harm for similar reasons as Tirey. He additionally argues that his conversation with Calloway after the first assault put Calloway on notice of the risk posed by Murray and Casey, and that Calloway's failure to stop the second assault constitutes deliberate indifference.

Martin has not plausibly alleged that Calloway was subjectively aware of a substantial risk of serious harm. After the first assault, Calloway allegedly asked Martin about the bruising around his eyes. In response, Martin concealed the true cause of his injuries and claimed that the bruises were a result of his "exercising with them young'uns." (Doc. 1-1 ¶ 31.) Martin contends that Calloway's response to the explanation of his injury indicates Calloway's knowledge of the risk of harm. This

---

[8]     Because Martin has failed to establish deliberate indifference on the part of Tirey, the Court need not address the "clearly established" prong of qualified immunity. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated . . . there is no necessity for further inquiries concerning qualified immunity."), *overruled in part on other grounds by Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Court is not persuaded.  According to Martin, Calloway was dismissive of Martin's explanation and responded "yeah-right."  (Doc. 1-1 ¶¶ 32.)  Martin appears to argue that Calloway's response indicates his belief that Martin's explanation was not credible and, therefore, there was an alternative, credible explanation for Martin's injuries.  But even assuming that Calloway did not believe Martin's explanation, it does not follow that he *knew* other inmates were the true cause of Martin's injuries, let alone that Murray and Casey specifically were the cause.  In fact, Martin does not claim that he ever informed Calloway—or any other Jail staff—that his bruises were the result of an assault by other inmates.  Further, for the reasons stated above in Part III.B.1.a, Martin does not sufficiently allege that Calloway was subjectively aware of Murray and Casey's prior assaults that were reported by other inmates or witnessed by Martin, and none of his other allegations are sufficient to show that Calloway was aware of a substantial risk of serious harm.

Martin has failed to plausibly allege that Calloway was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that he drew that inference.  *See Farmer*, 511 U.S. at 835.  Therefore,

Martin cannot maintain his failure to protect claim against Calloway, and it is due to be dismissed.[9]

### c. Robinson

For the reasons stated above in Parts III.B.1.a–b, Robinson was not deliberately indifferent to Martin's safety prior to the second assault. However, this Court must now consider Robinson's alleged conduct during the second assault.

Considering Martin's allegations that Murray and Casey beat him in the head, placed him in a chokehold until he fell to the floor, and then repeatedly slammed his face into the ground, Martin faced a substantial risk of serious harm while the second assault was ongoing. The complaint also alleges that, at the time of the second assault, Robinson was assigned to pod control and was responsible for supervising the inmates by observing the monitor from the surveillance camera in the day room. Martin also contends that the entire second assault took place in front of the surveillance camera and that Robinson "fail[ed] to timely respond and . . . stop the assault on Martin." Based on the complaint's allegations, this Court can reasonably infer that Robinson was watching the monitor while the second assault took place. Accordingly, Martin has sufficiently alleged that Robinson was subjectively aware of

---

[9]     For the reasons stated above in footnote 8, the Court need not address the "clearly established" prong of qualified immunity as to Calloway.

the risk of harm.  *See Farmer*, 511 U.S. at 842 (explaining that awareness of the risk "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence").  Further, Martin alleges that Robinson failed to timely respond to stop the assault and that no other guards came to stop it, even though Robinson was required to "alert the senior officer on duty of anything out of the ordinary."  (Doc. 1-1 ¶ 21.)  Doing *nothing* in the face of a brutal inmate-on-inmate assault that resulted in a 13-day stay in the ICU and multiple surgeries plausibly constitutes deliberate indifference.  *See Ensley v. Soper*, 142 F.3d 1402, 1407 (11th Cir. 1998) (explaining that if an official fails or refuses to intervene when a constitutional violation takes place in his presence, the official is directly liable under § 1983); *see also Murphy v. Turpin*, 159 F. App'x 945, 948 (11th Cir. 2005) (per curiam) (holding that *pro se* plaintiff's allegation that prison official failed to intervene "in the face of an inmate disturbance that he observed, particularly one which [plaintiff] alleges resulted in his loss of oxygen and necessitated CPR treatment," may constitute deliberate indifference to a substantial risk of serious harm).[10]

---

[10]    While the Court recognizes that unpublished opinions are not binding precedent, this case is cited because the Court is persuaded by its reasoning.

Having determined that Robinson's conduct during the second assault, as alleged by Martin, violated Martin's constitutional right to be free from inmate-on-inmate violence, this Court must now determine whether it was clearly established that Robinson's actions violated the Constitution. "A government official's conduct violates clearly established law when, at the time of the alleged conduct, the contours of the right are sufficiently clear that every 'reasonable official would have understood that what he is doing violates that right.'" *Mikko v. City of Atlanta*, 857 F.3d 1136, 1146 (11th Cir. 2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "[T]he salient question . . . is whether the state of the law at the time of an incident provided 'fair warning' to the defendants that their alleged [conduct] was unconstitutional." *Salvato v. Miley*, 790 F.3d 1286, 1292 (11th Cir. 2015) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014)). "That standard does 'not require a case directly on point, but existing precedent must have placed the . . . constitutional question beyond debate.'" *Mikko*, 857 F.3d at 1146 (quoting *Ashcroft*, 563 U.S. at 741). "[W]e look only to binding precedent—holdings of cases drawn from the United States Supreme Court, this Court, or the highest court of the state where the [conduct] took place." *Id.* (quoting *Gilmore v. Hodges*, 738 F.3d 266, 277 (11th Cir. 2013)).

For qualified immunity purposes, a right may be clearly established in one of three ways: "(1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law." *Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1291–92 (11th Cir. 2009) (internal citations omitted).  A broad legal principle announced in case law may be sufficient if it establishes the law "with obvious clarity to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct" violated the law.  *Vinyard*, 311 F.3d at 1351 (internal citation and quotation marks omitted); *see also United States v. Lanier*, 520 U.S. 259, 271 (1997) ("[G]eneral statements of the law are not inherently incapable of giving fair and clear warning, and . . . a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.'" (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987))).

At the time of the second assault, the law was clearly established that Robinson's conduct violated Martin's constitutional rights.  Inmates clearly have a constitutional right to be protected from assault by other inmates.  *See Zatler v.*

*Wainwright*, 802 F.2d 397, 400 (11th Cir. 1986) (per curiam) ("[I]t is well settled that a prison inmate has a constitutional right to be protected . . . from physical assault by other inmates."); *see also Farmer*, 511 U.S. at 832; *Harrison v. Culliver*, 746 F.3d 1288, 1299 (11th Cir. 2014); *Purcell ex rel. Estate of Morgan v. Toombs Cty.*, 400 F.3d 1313, 1320 (11th Cir. 2005).[11]  This "general constitutional rule" applies with "obvious clarity" to Robinson's alleged conduct here.  *See Lanier*, 520 U.S. at 271.  No reasonable jailer could conclude that it was constitutionally permissible to do *nothing* while observing an ongoing, sustained attack where two inmates beat another in the head, placed him in a chokehold until he fell to the floor, and then repeatedly slammed his face into the ground.  Considering Martin's allegations, no factually particularized case law was necessary to make it obvious to every reasonable jailer in Robinson's situation that his conduct violated Martin's constitutional right to be free from the risk of inmate-on-inmate violence.  Indeed, there might be no factually analogous decision simply because the existence of Martin's right is so clear that no one thought it worthwhile to litigate the issue.  *Cf. Burgess v. Lowery*, 201 F.3d 942, 945 (7th Cir. 2000).

---

[11]     The Eleventh Circuit has issued an unpublished decision holding that a prison official may be liable for failure to protect an inmate from an ongoing assault by another inmate.  *See Murphy*, 159 F. App'x at 948.  Because this decision is not binding precedent, it alone cannot clearly establish the law for purposes of qualified immunity.

In sum, Robinson was on notice that his total failure to act in the face of a brutal inmate-on-inmate assault violated Martin's constitutional right to be free from a substantial risk of serious harm. Therefore, Robinson is not entitled to qualified immunity, and his motion to dismiss is due to be denied.

### d. Underwood

Martin seeks to hold Underwood liable based on his supervisory status within the Jail. "It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (quoting *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999)). Rather, a supervisor may be liable either when he "personally participates in the alleged unconstitutional conduct or when there is a causal connection" between the supervisor's actions and the constitutional deprivation. *Id.* The requisite causal connection can be established in one of three ways: (1) "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so"; (2) "when a supervisor's custom or policy . . . result[s] in deliberate indifference to constitutional rights"; or (3) "when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinate would act unlawfully and failed to stop them

from doing so." *Id.* (internal citations and quotation marks omitted).  "The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." *Harrison*, 746 F.3d at 1298 (quoting *Hartley*, 193 F.3d at 1269).  The standard for supervisory liability is "extremely rigorous." *Cottone*, 326 F.3d at 1360.

Martin does not allege that Underwood personally participated in any unconstitutional conduct, so the viability of his supervisory claim depends on whether he plausibly alleged a causal connection between Underwood's actions and the constitutional deprivation.  Underwood argues that the complaint contains insufficient allegations of widespread abuse to put him on notice of a problem with inmate-on-inmate violence.  To successfully maintain a supervisory claim based on a causal connection, Martin cannot rely on "occasional, isolated attacks by one prisoner on another"; rather, he must show that he was confined "in a prison where violence and terror reign." *Harrison*, 746 F.3d at 1299 (quoting *Purcell*, 400 F.3d at 1320).  In other words, he must show that he was exposed to a "constant threat of violence." *Purcell*, 400 F.3d at 1320 (quoting *Woodhous v. Virginia*, 487 F.2d 889, 890 (4th Cir. 1973)).  For example, the Eleventh Circuit has concluded that evidence of "two to three pretty serious inmate fights over a period of nine months and of not

very many other fights over a four-year span" in a jail that houses over 100 inmates is insufficient to establish a substantial risk of inmate-on-inmate violence.  *See id.* at 1322 n.21.

Even construing the facts and all reasonable inferences in his favor, Martin cannot maintain a supervisory liability claim against Underwood.  While Martin's allegations may support the inference that he faced some generalized risk of attack, such allegations are insufficient to show that he was confined "in a prison where violence and terror reign."  *See Harrison*, 746 F.3d at 1299 (quoting *Purcell*, 400 F.3d at 1320).  Martin makes two allegations about inmate-on-inmate violence: (1) he witnessed Murray and Casey instigate "six or seven" fights before the first assault, and (2) other inmates had reported "multiple" assaults by Murray and Casey to jail staff.  However, there are no allegations of the sections of the jail in which the attacks allegedly occurred that would put Martin's allegations in context.  Nor are there allegations of the severity of any of these incidents.  *Cf. Purcell*, 400 F.3d at 1322 n.21.  Additionally, Martin's allegation of "multiple" assaults is vague, as "multiple" could mean 2, 10, 100, or some other number.  Moreover, Martin does not allege over what time period the "multiple" assaults occurred.  While Martin is entitled to have the facts and reasonable inferences drawn in his favor, this entitlement does not excuse his obligation to state a plausible claim for relief.  In sum, Martin has failed to

allege abuse that was "obvious, flagrant, rampant and of continued duration" sufficient to establish Underwood's § 1983 liability.  *See Harrison*, 746 F.3d at 1298.

Nor can Martin succeed under a failure to train theory.  Supervisors can be liable under § 1983 for failure to train only when such failure reflects a deliberate or conscious choice to follow certain action—in other words, a "policy."  *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) (citing *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)).  To establish a "deliberate or conscious choice," Martin must show that Underwood "knew of a need to train and/or supervise in a particular area and . . . made a deliberate choice not to take any action."  *See id.*  Martin alleges in conclusory fashion that Underwood's training and staffing policies were inadequate, but he does not allege specific facts about the current training.  Moreover, as explained above, Martin's allegations are insufficient to show that Underwood was aware of prior incidents where inmates' constitutional rights were similarly violated. *See id.* at 1351.  Accordingly, this Court cannot infer that Underwood was on notice that current training was inadequate, nor that he made a deliberate choice not to take any action.

Because Martin has not sufficiently demonstrated a basis for supervisory liability against Underwood, the § 1983 claims against Underwood are due to be dismissed.

The Court will now consider Martin's state law claims.

### 2. State Law

Underwood argues that he is entitled to sovereign immunity under either Ala. Code § 36-22-3[12] or § 14 of the Alabama Constitution because he was Sheriff of Walker County at the time of Martin's injuries.  Calloway, Robinson, and Tirey argue that they are entitled to "jailer immunity" under Ala. Code § 14-6-1.

### i. Underwood

In Alabama, county sheriffs are considered state officials. *See McMillian v. Monroe Cty.*, 520 U.S. 781, 783 (1997).  They enjoy sovereign immunity from claims pursuant to § 14 of the Alabama Constitution when they are sued "for actions taken in executing the duties of their offices."  *Ex parte Davis*, 9 So. 3d 480, 483 (Ala. 2008).  This immunity bars claims against sheriffs sued in their individual or official capacities. *Ex parte Davis*, 930 So. 2d 497, 500 (Ala. 2005).  Immunity under § 14 is "an affirmative defense for which the burden of proof rests with those asserting it." *Hickman v. Dothan City Bd. of Educ.*, 421 So. 2d 1257, 1259 (Ala. 1982).  Martin alleges that Underwood failed to have any policy for the Jail to respond to and investigate inmate on inmate assaults, that he had an inadequate policy for

---

[12]     Ala. Code § 36-22-3 does not provide a basis for immunity for sheriffs.  Rather, it sets forth a sheriff's general duties and explains that persons "undertaking such duties for and under the direction and supervision of the sheriff" are entitled to the same immunities as the sheriff.  Ala. Code § 36-22-3.

disciplining or segregating violent inmates who pose a risk of harm, that he did not properly supervise or train Jail staff, and that he is liable for the actions of the Jail staff. All of these allegations amount to a claim that Underwood failed to properly carry out his job duties.

However, the Alabama Supreme Court has recognized several exceptions to § 14 immunity. In *Poiroux v. Rich*, 150 So. 3d 1027, 1038 (Ala. 2014), the court articulated five categories of cases from which sheriffs are not immune:

> [Actions brought] (1) to compel him to perform his duties, (2) to compel him to perform ministerial acts, (3) to enjoin him from enforcing unconstitutional laws, (4) to enjoin him from acting in bad faith, fraudulently, beyond his authority, or under mistaken interpretation of the law, or (5) to seek construction of a statute under the Declaratory Judgment Act if he is a necessary party for the construction of the statute.

*Id.* (internal quotation marks omitted) (quoting *Ex parte Donaldson*, 80 So. 2d 895, 898 n.1 (Ala. 2011)). Separately, the court has articulated six categories of cases from which state officials are not immune. *See Ex parte Wilson*, No. 1170982, 2019 WL 988896, at *2–3 (Ala. March 1, 2019). Only the sixth category[13] is relevant to this case:

> (6)(a) actions for injunction brought against State officials in their representative capacity where it is alleged that they had acted fraudulently, in bad faith, beyond their authority, or in a mistaken interpretation of law, and (b) **actions for damages brought against State officials in their individual**

---

[13]      The remaining categories are the same as in *Poiroux*, albeit listed in a different order. *See Ex parte Wilson*, 2019 WL 988896, at *2; *Poiroux*, 150 So. 3d at 1038.

**capacity where it is alleged that they had acted fraudulently, in bad faith, beyond their authority, or in a mistaken interpretation of law**, subject to the limitation that the action not be, in effect, one against the State.

*Id.* at *3 (emphasis added) (internal quotation marks and citations omitted).

Underwood is clearly immune from Martin's official capacity claims. *See Ex parte Davis*, 930 So. 2d at 500. Martin argues that his individual capacity claims fall within the sixth category articulated in *Ex parte Wilson*, and therefore, they are not barred by sovereign immunity. He reasons that Alabama sheriffs are state officials and that *Ex parte Wilson* is the most recent case on point dealing with exceptions to sovereign immunity. Underwood argues that the damages portion of the sixth category is inapplicable to Alabama sheriffs, citing *Poiroux*'s omission of individual capacity "bad faith" damages claims from the list of exceptions to sovereign immunity for sheriffs. He points out that neither *Ex parte Wilson* nor the cases upon which it relied involved sheriffs. Stated differently, Underwood argues that, reading Alabama Supreme Court precedent together, sheriffs are immune from individual capacity "bad faith" damages claims, but all other state officials are not. He also cites a case from the Middle District of Alabama which reached this conclusion. *See Callwood v. Phenix City*, No. 2:15-cv-182-WHA, 2015 WL 5234829, at *8 (M.D. Ala. Sept. 8, 2015).

Upon review, this Court concludes that the sixth exception as stated in *Ex parte Davis* is inapplicable to sheriffs. *Ex parte Davis* is not a case involving a sheriff. This Court finds *Poiroux*, a case involving a sheriff, to be controlling on this question. Martin's claims against Underwood are for monetary damages and do not fall within one of *Poiroux*'s exceptions to sovereign immunity for sheriffs. *See Poiroux*, 150 So. 3d at 1038. Accordingly, Underwood is entitled to sovereign immunity from the state law claims brought against him in his individual capacity.

## ii.  Calloway, Robinson, and Tirey

In Alabama, jailers are "entitled to the same immunities and legal protections granted to sheriffs . . . as long as such persons are acting within the line and scope of their duties and are acting in compliance with the law." Ala. Code § 14-6-1. To be immune from suit on Martin's state law claims, Calloway, Robinson, and Tirey must therefore comply with the requirements of § 14-6-1.

First, this Court must determine whether Calloway, Robinson, and Tirey were acting "within the line and scope of their duties." Martin alleges that all of their relevant actions occurred while they were executing their duties as jailers. Therefore, they were acting "within the line and scope of their duties" while performing their relevant actions.

Next, this Court must determine whether these officials were "acting in compliance with the law." Section 14-6-1 does not immunize jailers from liability under state law if they violated the plaintiff's *federal* constitutional rights. *See Taylor v. Hughes*, 920 F.3d 729, 734 (11th Cir. 2019). Although Alabama courts have not explained the full scope of the phrase "acting in compliance with the law," *see Young v. Myhrer*, 651 F. App'x 878, 881–82 (11th Cir. 2016) (per curiam) (explaining that the Alabama Supreme Court has declined, on two occasions, to answer a certified question regarding its meaning), Martin's sole argument is that jailer immunity is inapplicable because he has stated a claim against these defendants under federal law. The defendants respond that because the federal claims against them fail, the state law claims fail as well.

Because this Court concludes that Martin plausibly alleged a § 1983 claim against Robinson, Robinson was not acting "in compliance with the law" and thus does not qualify for immunity under § 14-6-1 at the motion to dismiss stage. Accordingly, Robinson's request to dismiss the state law claim against him is due to be denied. By contrast, because this Court concludes that Martin failed to state a § 1983 claim against Calloway and Tirey, this Court also concludes that they were acting "in compliance with the law" and qualify for immunity under § 14-6-1. Accordingly, the state law claims again Calloway and Tirey are due to be dismissed.

## IV.   CONCLUSION

For the reasons stated above, Walker County's motion to dismiss (doc. 3) is due to be DENIED.  Further, the law enforcement defendants motion to dismiss (doc. 5) is due to be GRANTED IN PART and DENIED IN PART.  The § 1983 causes of action against Underwood, Calloway, and Tirey are due to be DISMISSED WITH PREJUDICE.  Further, the state law claims against Underwood, Calloway, and Tirey in their individual and official capacities are barred by sovereign immunity and are therefore due to be DISMISSED WITH PREJUDICE.

**DONE** and **ORDERED** on May 13, 2020.

_____

L. Scott Coogler
United States District Judge

199335